Received
2022 JAN 18 PM 12:48
CLERK
U.S. DISTRICT COURT

Ana Maria Ravines de Schur
3848 S West Temple
P.O. Box 50
Salt Lake City
UT, 84115-1289
Cell: 916-801-4756
amravinworks@gmail.com

FILED
2022 JAN 19 PM 1:53
CLERK
U.S. DISTRICT COURT
Case: 2:22−cv−00039
Assigned To : Oberg, Daphne A.
Assign. Date : 1/18/2022
Description: Ravines de Schur v. Department of Workforce Services et al

# In The United States District Court For the District of Utah

| | |
|---|---|
| **Ana Maria Ravines de Schur** | |
| **Plaintiff,** | **CIVIL CASE:** |
| **VS** | |
| **Utah Department of Workforce Services, Office of Refugees** | |
| **Utah Valley Refugees in Provo, Utah** | **[DEMAND FOR JURY TRIAL]** |
| **Salt Lake City Housing Authotity** | |
| **Select Health Care** | |
| **Valley Behavioral Health** | |
| **Defendants.** | |

### COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiff alleges as follows:

1. Plaintiff calls upon the court to enforce 8 U.S. Code § 1522 authorization of programs for domestic resettlement of and assistance to refugees. Plaintiff calls upon the court to enforce 22 U.S. Code § 6401 for the right to freedom of religion and protection against religious persecution in the United States as a fundamental law that is being violated in the State of Utah by State of Utah Contractors to the U.S. Federal Government. Plaintiff also calls for her refugee rights as stipulated by the Committee on the Elimination of Racial Discrimination, in its general recommendation N° 30 (2004) on non-citizens, and the Committee on Economic, Social and Cultural Rights, in its general comment N° 14 (2000) on the right to the highest attainable standard of health, both stress that States parties should respect the right of non-citizens to an adequate standard of physical and mental health by, inter alia, refraining from denying or limiting their access to preventive, curative and palliative health services. The Special Rapporteur on Health has also stressed that sick asylum-seekers or undocumented persons, as some of the most vulnerable persons within a population, should not be denied their human right to medical care.

2. Plaintiff brings evidence of refugee resettlement fraud, discrimination that adds to the notion of persecution and torture, omission of health provisions by Medicaid supported health agencies in the State of Utah, continuing hate crimes covered up by the accused interagencies in violation of refugee's rights to Separation of Church and State. The criminal activity has been perpetrated by State of Utah Contractors to the Federal Government servicing health and human services, refugee services programs and employment agents in charge of refugees' support.

3. Plaintiff demands social and economic restitution, as well as an organized refugee resettlement to a safer area of the United States, where the refugee' religion will not play

    any substantial role to worsen her experience with systemic discrimination, as it is demonstrated in the State of Utah.

4. Plaintiff asks for reparations to a total of $300,000.00 that must provide her family with a humble startup fund to organize business solutions in an independent financial development in the State of Massachusetts. Plaintiff demands refugee assistance, unemployment support, health and HUD Section Eight arrangements to reset,tle with her family to the State of Massachusetts, where they find a much better access to equality in health and economic measures for their recovery that are structurally absent in the State of Utah, because of the non-separation of church and state represented by the State of Utah polarized contractors' handling refugee matters.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, 15 U.S.C. § 1691e(h). Venue is proper in this district under 28 U.S.C. § 1391(b) because the actions and omissions giving rise to the allegations occurred in the State of Utah, and the Plaintiff Ana Maria Ravines de Schur is a citizen of Germany living in the United States under political asylum, and the total restitution demanded is larger than $75,000.00.

## FACTUAL ALLEGATIONS

6. On August 24, 2019, Plaintiff signed up into a legally binding refugee resettlement contract in the City of Provo, Utah, after indications and assurance of a supportive refugee resettlement service by the Utah Department of Workforce Services.

7. The refugee resettlement contract produced and signed by Utah Valley Refugees was violated by Mr. Leonard Bagalwa, its own Executive Director and only paid employee, from the first month after the refugee contract's was signed.

8. The Utah Valley Refugees offered and undersigned a refugee resettlement contract that was supervised and vouched for by the Refugee Agency of the Utah Department of Workforce Services in the City of Provo, in the State of Utah.

9. Plaintiff was left resourceless from the very first week after signing up to the said refugee resettlement contract. Although the Director of Utah Valley Refugees offered Provo Landlord DEE OLDROYD to pay fifty percent of the rent costs contained in the refugee resettlement agreement that Director Leonard Bagalwa signed for the Landlord in Provo, these payments were never made in time or showing any good will. The Landlord Mr. Oldroyd had to keep going several times each month to seek the rent payment that Mr. Bagalwa had voluntarily offered under the refugee resettlement contract. In December 2019, Mr. Bagalwa expressed to Landlord DEE OLDROYD that he would no longer support the refugee's needs and that she would be on her own.

10. Plaintiff's rights to two years of refugee resettlement assistance after interrogation with the USCIS at the Rome Italy USCIS of the American Embassy, have been wasted and never delivered through these nonprofit and state contractors non-responding to the federal government on funds destined to the organization and well being of refugees in the State of Utah.

11. When Plaintiff demanded an explanation to the suspension of refugee services (Director Bagalwa never sent a clear written termination of the refugee resettlement contract that he had signed with the Plaintiff and with the Landlord), she received an informal and very unprofessional response by the refugee resettlement Director via Email. The Utah Department of Workforce Services, that had initially sent the Plaintiff to the delinquent nonprofit refugee resettlement agency, attempted to evade any responsible action by

arguing that the nonprofit had "nothing to do" with the DWS, but that it was a private refugee agency supported by the LDS Church.

12. The director of the LDS Public Relations office, a man named Mr. Owen explained several times on the phone to the plaintiff that his organization, the LDS Church, funded the nonprofit Utah Valley Refugees agency, but he added that his church held no shared responsibility for the nonprofit's actions and omissions.

13. The Utah DWS admitted to not be related to the Utah Valley Refugees nonprofit refugee resettlement organization, although a statement by the lawyer of the DWS confirmed the opposite. This lawyer was silently removed from office after he delivered a honest reply to the Plaintiff, explaining that the agency had reclassified her efforts as "Spam", and that no services were coming in her direction from the DWS. At the moment, the lawyer has been removed, and there is no further legal service responding for Information And Referrals at the Utah DWS.

14. Plaintiff was offered furniture with which to organize her belongings in the Provo City apartment that she rented in August 2019 under the co-signatory intervention of Refugee Resettlement Director Leonard Bagalwa from Utah Valley Refugees. Mr. Bagalwa never delivered the furniture and clothing vouchers that he had promised at the signature of the refugee resettlement contract. Instead, both Leonard Bagalwa and the Refugee Agency of the Utah Department of Workforce Services insisted that the Plaintiff Ana Maria Ravines de Schur should contact a local LDS Bishop in the City of Provo to request the furniture voucher from him.

15. Plaintiff followed the directions of both the State Contractor (Utah Department of Workforce Services' Refugee Agency) and the nonprofit refugee resettlement director Leonard Bagalwa (Utah Valley Refugees), and contacted the local LDS Bishops that she had been indicated by the two agencies in search of the fulfillment of the furniture and clothing vouchers. After void efforts at contacting neighboring LDS Bishops in the Provo

Utah neighborhood where she rented her Provo apartment, Plaintiff was told by the LDS Headquarters in Salt Lake City to contact Bishop ROBIN ROUNDY, a professor of mathematics at Brigham Young University who presided over an LDS ward neighboring the Plaintiff's address in the City of Provo. Her three encounters with Bishop Roundy went as follows:

a. In her first encounter at his office, Bishop Roundy told Plaintiff that he could not help her, "unless…" – unless she became a member of the LDS religion through baptism.

b. Two additional visits by Bishop Robin Roundy followed the Plaintiff's first encounter. Those took place at the home of the Plaintiff. Mr. DEE OLDROYD, landlord of the Plaintiff, was present in the two meetings at the Plaintiff's request. Bishop Roundy continued to express that the only way he would provide a furniture voucher through the DESERET INDUSTRIES (an LDS second hand store that also sells new made wood furniture) in Utah would be, if Plaintiff converted to the LDS religion. In one of the two meetings with the bishop at the Plaintiff's home address, Mr. DEE OLDROYD demanded an answer from Plaintiff, to the question if she had "a testimony" of the holiness of Mormon Prophet Joseph Smith. Plaintiff was honest as she expressed that the sexual and public lives of the Profets of Mormonism did not speak to her sense of religious belonging in any ways. Furthermore, she revealed to these men that she had been a member of the LDS religion in Germany, and had to relinquish her membership, after she had to undergo a surprising non consensual sexist ritual in the Frankfurt Germany temple, after which the Plaintiff had to undergo years of mental health trauma treatment in Germany to come to the conclusion that the cultic practices of the Mormons are not a community of conscience that she would like to be involved with.

    c. After the second meeting with Bishop Roundy at her apartment in the City of Provo in Utah, the Plaintiff contacted the USCIS to request information regarding her rights to separate her religious beliefs from her refugee resettlement process. She also contacted refugee, mental health and human services agencies in the State of Massachusetts, in the State of New York, in the State of Colorado and in the European Union. All mental health advocates referred the Plaintiff to the existence of Amendment I of the United States Constitution that states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

16. Plaintiff has surveyed numerous refugees of color in the state of Utah. In all cases, these refugees expressed discomfort when they admitted that they don't really like to live in the state of Utah, because they found out after they arrived from African countries that the Mormons (who run the state) come from a heavy history of White Supremacy and condemnation of members of the society who are not white.

17. Plaintiff also encountered in the first quarter of 2019 numerous African refugees in the State of Pennsylvania, before she returned to the City of Provo. In Pennsylvania, these refugees of color reported that their port of entry had been the state of Utah, but they left… because they had been confronted with the State of Utah's structural racism after they arrived. In all cases, the refugees expressed their discomfort and disagreement with the pressures they had to face after they were coerced to become Mormons following their arrival in the state of Utah.

18. In retaliation to her disinterest to become a member of the Mormon church, Plaintiff was left without any furniture, eating and sleeping on the floor through two long years, from

August 24, 2019 till July 2021. The hardships were witnessed by numerous case managers of Valley Behavioral Health who visited the Salt Lake City apartment, but they appeared to not show any concerns at the destitute conditions that the Plaintiff was living under; this enraged Plaintiff who continued documenting her living conditions to national and international human rights agencies. A worker of Select Health Services instructed a case manager of Valley Behavioral Health to arrive at Plaintiff's home and photograph the conditions. A case manager photographed the apartment so that Plaintiff could demonstrate that the state and nonprofit refugee agencies had failed in their promise to serve the refugee's needs.

19. An international intervention led Plaintiff to seek human services by the Salvation Army in Rome Italy first and in the State of Utah next. The Salvation Army of Salt Lake City offered a furniture voucher that could replace the cardboard boxes that the Plaintiff had been living under since August 2019 for functionable furniture.

20. In December 2019, Plaintiff communicated with the Utah Department of Workforce Services. She requested help with transportation,but the DWS officials referred her back to the refugee resettlement agency. The Director of the delinquent Refugee Resettlement Agency had stopped communicating back with Plaintiff. In order to not lose her apartment in Provo, Utah, Plaintiff kept accepting employment through temp agencies. These sent Plaintiff to work at warehouses that were in a very inconvenient location from her apartment. Although there were local employment options in the area, the Director of the delinquent Refugee Resettlement agency did not produce any referrals that Plaintiff needed to be hired as a refugee on a walking distance to her apartment. Plaintiff kept commuting back and forth to work with expensive payments to UBER taxis, until she had no money to pay for the UBER transportation to a job that paid her 13 Dollars an hour. Plaintiff lost her job.

21. Utah Department of Workforce Services and Utah Valley Refugees refused to help Plaintiff out. Plaintiff was told by the Utah Department of Workforce Services that they had "nothing to do" with the Utah Valley Refugees nonprofit organization, because that was a nonprofit organization funded by the LDS Church and they (the DWS) were a state funded agency. This information proved to be a lie when Plaintiff demanded a copy of the GRAMA Report that demonstrated that the DWS was funding the nonprofit organization with funds that came to the State of Utah from the United States Federal Government for the support and well being of the refugees. Copies of the written evidence are available.

22. The lawyer who represented the DWS was sent into silent oblivion after he declared in writing that the Department (DWS) had blocked Plaintiff's access to services, because of her grievances. The lawyer's message proved retaliation by the State of Utah contractors to the Federal Government that should not have proceeded. Evidence is documentable.

23. Respondents violated 18 U.S. Code § 241. Title 18, U.S.C., Section 241 - Conspiracy Against Rights. This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same. In an email message from June 24, 2021, Case Manager HUNTER KEETCH, of Valley Behavioral Health informed Plaintiff in writing: "I have confirmed with the Medicaid team that a bus pass will not be sent due to the lawsuit with DWS." - However, there was no "lawsuit" in place until this day against the DWS, because the local agencies that provide legal services to low income petitioners failed at providing legal support in the presence of proven human and civil rights violations by

state and nonprofit service providers against a refugee in the State of Utah. As a consequence, Plaintiff lost opportunities to work at home at the beginning of the pandemic, as the DWS refused to provide a transportation UTA ticket, to allow the Plaintiff to attend training for work in Salt Lake City.

24. The retaliatory actions undertaken by agents of the Utah Department of Workforce Services (DWS) left the Plaintiff without any means to survive during the long period starting August 2019 until this day (the court may consider that these abuses were perpetrated through the start and unfolding of the world pandemic CoVid19). These activities constitute acts of retaliation while the same agents are proven to be creating the conflicts that affect the refugee.

25. Respondents violated 18 U.S. Code § 1512, intimidating Ana Maria Ravines de Schur in her political asylum case and privacy standards for the protection of the Schur family. Respondents attempted to induce further conflicts that have been intensified by the total lack of basic services produced and supported by the DWS and their associate agencies, such as the Utah Valley Refugees, Housing Authority of Salt Lake City, mental health providers such as Valley Behavioral Health and Select Health.  The upcoming events after Ana Maria Ravines de Schur found help to move to a different area of the State of Utah continued to intensify the feelings of anxiety and fear at the clear perception of living without the guarantees withheld in her protected status in the United States, as Mormons in public office continued threatening to block the Plaintiff''s basic rights under her refugee status.

26. Respondents violated 18 U.S. Code § 873. Plaintiff's family and her sons live in the United States under USCIS Protected Status. The family was granted Political Asylum in 2002.  Plaintiff has made numerous efforts to find an alternative safe haven in the United States. The family returned to the State of Massachusetts in 2010, but their refugee

resettlement was not successful, because one of her sons could not finish high school education in the State of Massachusetts, as the graduation requirements of the state of Massachusetts are much higher than those in the State of Utah. The family returned several times to report their circumstances at USCIS offices in the European Union.

27. Respondents violated 15 U.S. Code § 1692d and 18 U.S. Code § 241. Plaintiff has lived under Protected Status in the United States since 2002. The Utah mental health contractors to the federal government have continued to threaten the livelihood of the Schur family in the United States also with a proven public defamatory narrative that the Plaintiff denounced to the supervisors of Valley Behavioral Health and Select Health. Instead of producing efficient protective conditions to secure the Plaintiff's safety standards as guaranteed through her refugee status, the supervising agents at both Select Health and Valley Behavioral Health have continued to omit corrective action against the inequality and violent acts perpetrated by their own workers, most of whom are proven social workers, case managers and mental health counselors graduated from Brigham Young University, which is a very complicated academic institution that fails to recognize violations that come through the non-separation of church and state policies that infest all areas in the State of Utah. Currently Plaintiff is living without any health or mental health services, because of the omissions referred about in Plaintiff's grievances against the two health providing agencies in the State of Utah.

28. The State of Utah Respondents are in violation of The Convention on the Suppression and Punishment of the Crime of Apartheid (hereinafter Apartheid Convention, because they act in the understanding of white privileges that were systematically secured by the Mormons in protection of the economic development of Germanic phenotypes that the religious leaders carefully multiplied, even through the imposition of human reproduction in endogamy.

29. All the violations that Ana Maria Ravines de Schur and her family that led to her family being granted political asylum in the United States do not fall under any statutes of limitations, because they were proven acts against humanity. Hence these burdens are additional to the pain and suffering inflicted by the State of Utah contractors to human services programs, as they are in violation of the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity. As it is stated in Article 1: a. War crimes as they are defined in the Charter of the International Military Tribunal, Nurnberg, of 8 August 1945 and confirmed by resolution 3 (1) of 13 February 1946 and 95 (I) of 11 December 1946 of the General Assembly of the United Nations, particularly the "grave breaches" enumerated in the Geneva Conventions of 12 August 1949 for the protection of war victims;  (b) Crimes against humanity whether committed in time of war or in time of peace as they are defined in the Charter of the International Military Tribunal, Nurnberg, of 8 August 1945 and confirmed by resolutions 3 (I) of 13 February 1946 and 95 (I) of 11 December 1946 of the General Assembly of the United Nations, eviction by armed attack or occupation and inhuman acts resulting from the policy of apartheid, and the crime of genocide as defined in the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, even if such acts do not constitute a violation of the domestic law of the domestic law of the country in which they were committed.

30. The Salt Lake City Housing Authority violates refugee and immigrants rights to fair housing. The Fair Housing Act protects people from discrimination when they are renting or buying a home. Therefore, refugees and immigrants are protected from discrimination based on their ancestry or birthplace (their national origin) in housing-related transactions.  Plaintiff has continued to receive disinformation and discriminatory treatment by the person who is in charge of her section eight housing

voucher. Although Plaintiff has reported the situation to an HUD regional supervisor, this person persists in ignoring well founded grievances. It appears that the existence of the Plaintiff's complaints against mismanagement by the inter agencies accused in this complaint, have created a generalized climate of segregation that is non typical for the services intended through the fair Housing Act enacted in the United States in 1968. Theplaintiff demands that her family be rescued through the HUD Housing Voucher to find safe haven in the State of Massachusetts, far away from the manipulative abuses they are experiencing in the State of Utah by the said state contractors to federal funded programs that aren't being distributed fairly..

31. The State of Utah Contractors addressed in this complaint as Respondents are in violation of The Declaration on the Granting of Independence to Colonial Countries and Peoples adopted by the United Nations General Assembly on 14 December 1960. Although the United States is not alone in the misuse and abuse of the law and the resources through biased acts of segregation that deprive ethnic minorities from the right to equal access to the radical promise of the United States (Life, Liberty and Pursuit of Happiness). The problem in the State of Utah is that there is an additional ideological brainwashing into White Supremacy by a class dominated by one group of people believing that their White Supremacy is superior to colored communities, because they are chosen and privileged by the godhead. The Mormons, who are in control of the resources in the State of Utah, have been indoctrinated and have become very articulate for 160+ years at teaching their followers that white people have rights but people of color don't have the same rights, because they sinned before they were born. This is worse than any other racist society existing in the United States. The inception of a godhead telling the world that people of color are here to suffer, because they sinned before they were

born, must be reinterpreted in contemporary language as an act of **Domestic Terrorism**. People of color in a place like the State of Utah are not being given equal rights, unless they agree to get baptized in the religion of the Mormons, a religion that contains so many elements of White Supremacy that no person of color would volunteer to assume that creed and tradition as a personal doctrine or as a sincere belief system. By supporting a men-made dogma that chastises people of color under the mandates created by a religion that claims rights to White Supremacy that for so long has proclaimed the segregation of those who are not whites, the Mormons have claimed a fictitious identity of Sanctified Whiteness that is in violation of Federal and International Laws against the crimes of Apartheid. A person of color who tries to survive in such a White Supremacist society and culture, that exalts racists as prophets and vicious sexual offenders and inbreeders as holy men, is not going to be able to provide the luxury of equal access to any resources for the existing ethnic minorities, because the system in a place like the State of Utah perpetuates the privilege of the ruling elite, which is Whiteness. This is why abuses and violations against the rights of ethnic minorities in the State of Utah are not followed by any investigative process.

32. Plaintiff and her family have been abused in numerous documentable situations in the state of Utah, but there is the malicious complicity of the state contractors that should but do not distribute the healing of refugee resources equally, so that people of color are not going to be able to live free of the impact of racism and discrimination that lies in the foundations of the United States as a country and that has persisted in an augmented version through the religious ideology of the Mormons who dominate a US State. The system of racial discrimination in the State of Utah makes it difficult if not impossible for ethnic minorities that are affected by the

systemic segregation carefully nestled by the founders to convict those who violate their rights as ethnic minorities. City services and constituent's services in the State of Utah are organized only to serve and be accountable for those who hold the power of their race, particularly after the Mormons have carefully shaped a culture that is ideologically driven to be desensitized to the abuses committed against people of color, because the masses in White Utah have been brainwashed to believe that people of color are guilty for sins they committed before they were born. For these reasons, the Plaintiff is requesting an organized resettlement of her family out of the White Supremacist State of Utah that denies her and her family of the equality that their refugee status deserves.

### **PLAINTIFF DEMANDS FOR REPARATIONS AND PRAYER FOR RELIEF**

Plaintiff asks the court to order these respondents to pay for the following reparations and restitution over hardships and duress and PTSD that they have caused to all parties associated. The demands are as follows:

1. Ana Maria Ravines de Schur suffers from PTSD after surviving not only the traumas that led her family to obtain political asylum in the United States from Germany, but she is being re-traumatized by the abuses produced by the Utah State Contractors mentioned above, whose actions only worsen the stress and duress put on her refugee status over the past two years.

2. Ana Maria Ravines de Schur, being impoverished by induction through the biased acts of State of Utah contractors to the federal government and in the absence of Medicaid or Medicaid services for the poor, is in need of professional trauma therapy and care that Medicaid and Medicare do not provide for her in the State of Utah, because of the reasons explained in the Complaint. The portion allotted to Ana Maria Ravines de Schur, totalling $144,000.00 to cover for the next 10 years of therapy needed for Ana Maria Ravines de Schur at the standard rate of one weekly visit of $150 per week.

3. Plaintiff demands starting funds to set up an independent business in the state of Massachusetts, for the production of bronze staircases, ornamental facades, memorable sculptures and other showpieces for office buildings, high-end stores, hotels and restaurants, museums, arts centers, residences and other public and private places Financial startup fund totalling $300,000.00.

4. Plaintiff suffers from COMPLEX PTSD due to existential fears retraumatized by State of Utah agents through denial of basic rights, threats and intimidation. Plaintiff requires complex therapy to deal with the issues that these organized abusers have produced against her mentally and economically.  Plaintiff is asking for professional health and mental health support covering her family for 144,000.00 for the next 10 years. Multiple violations have affected the plaintiff's family integration as refugees to the United States through violations instigated by State of Utah contractors to the Federal Government. These violations were caused by acts of xenophobia, nepotism, corruption, malfeasance, racketeering and most recently acts of organized discrimination that adds to the notion of persecution incited by public services actors employed by State of Utah agencies that charge the US Federal Funding for Medicaid services.

5. Plaintiff demands payment for her refugee family relocation with a 20 feet UHaul transport of all personal belongings to the state of Massachusetts totalling $7,000.00.

6. Plaintiff demands the.Respondents to supply for her personal needs of complex dentistry, totalling $25,000.00

7. Plaintiff demands that Respondents pay for a federal attorney to represent the Diversity of Citizenship Rights for Ana Maria Ravines de Schur and her family, as well as all associated legal fees and related expenses totaling $40,000.00.

Plaintiff brings sufficient evidence containing communication trails and photographic evidence

**JURY DEMAND**

The plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted:

January 17, 2022

*Ana Maria Ravines de Schur*

_____

Ana Maria Ravines de Schur
**3848 S West Temple**
**P.O. Box 50**
**Salt Lake City**
**UT, 84115-1289**
**Cell: 916-801-4756**
amravinworks@gmail.com

**CERTIFICATE OF SERVICE**

Ana Maria Ravines de Schur hereby certifies that on January 17, 2022, this document was placed as an electronic response in the United States District Court for the District of Utah with copies to the persons in charge of the Court's electronic mailing systems processing on the following email addresses indicated in this certificate of service as requested by the plaintiff.

- **Noemi Torres**, Intake Clerk, US District Court, District of Utah
- **Jeff Taylor**, Operations Manager, US District Court, District of Utah
- **Amy Faust**, Docketing Clerk, US District Court, District of Utah